UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EVANSTON INS. CO.,                  )
                                    )
                    *Plaintiff*,    )          CASE NO.    14-CV-0085-BJR
                                    )
        v.                          )
                                    )          ORDER GRANTING PLAINTIFF'S
                                    )          MOTION FOR SUMMARY JUDGMENT
CLARTRE, INC. and SCOTT CLARKE,     )
                                    )
                    *Defendants*.   )
_____)

## I.      INTRODUCTION

Plaintiff Evanston Insurance Company ("Evanston") is the insurer for Defendants Clartre, Inc. ("Clartre") and Scott Clarke ("Clarke") (collectively, "Defendants"). Defendants were sued in Whatcom County Superior Court ("the underlying litigation") for misappropriation of trade secrets and confidential information, violation of the Lanham Act, 15 U.S.C. § 1125(a),[1] violation of Washington's Unfair Business Practices and Consumer Protection Act, RCW § 19.86.020, and other related claims. *See* Decl. of David R. Greenberg, Docket No. 71, Ex. A (Amended Compl.) ¶¶ 75-154. Plaintiff is currently providing legal defense to Defendants in the underlying action

---

[1] The Lanham Act is a federal trademark statute that prohibits false advertising and trademark infringement and dilution. Section 1125(a) prohibits trademark dilution.

under a reservation of rights.  Plaintiff now seeks a declaratory judgment that it has no duty to defend or indemnify[2] Defendants in the underlying litigation.  Before the Court is Plaintiff's Motion for Summary Judgment, Docket No. 30, filed on August 13, 2015.  The motion is fully briefed and ripe for resolution.  Having reviewed the parties' briefs and other documents submitted to the Court together with the relevant legal authorities, the Court GRANTS Plaintiff's motion. The Court's reasoning is set forth below.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

As indicated above, Plaintiff Evanston provides insurance to Defendants Clartre and Clarke.  Compl. ¶¶ 1, 9.  Defendant Clartre is one of several defendants in a lawsuit currently pending in Whatcom County Superior Court.  *Id.* ¶ 17.  Clartre, along with the other underlying defendants, are allegedly owned or controlled by Defendant Scott Clarke.  *Id.* ¶ 18.  Clartre was also a counterclaim-defendant in another lawsuit originally filed in federal court and later remanded to Whatcom County Superior Court.  *Id.* ¶ 19.  The two suits were combined into the underlying litigation because they involve substantially similar claims by the same plaintiff, Global Building Products, Ltd. ("Global").  *Id.* ¶ 20.  In the underlying litigation Global alleges, *inter alia*, that the Clarke Group[3] misappropriated proprietary wood-treatment chemical technology.  *Id.* ¶¶ 21-23.  Global also alleges that the Clarke Group improperly used product certifications/approvals

---

[2] The parties agree that the duty to defend is broader than the duty to indemnify and, as such, if Defendants do not have a duty to defend, they likewise do not have a duty to indemnify.  Accordingly, the parties, and this Court, discuss only the duty to defend.

[3] A number of companies allegedly owned and/or controlled by Scott Clarke and Louis Clarke.  The group is comprised of Defendant Clartre, Blue Mountain Log Sales, Ltd., American Treating Company, LLC, American Pacific Wood Products, Inc., and the Clarke Group Canadian Company (collectively, the "Underlying Defendants").  Compl. ¶ 18.

granted by the California State Fire Marshall ("CSFM") and ICC Evaluation Service ("ICC-ES").[4] *Id.* ¶¶ 21, 24.

On August 23, 2013, Defendant Clartre requested defense and indemnification against Global's claims in the underlying litigation. *Id.* ¶ 26. Clartre asserts that the allegations against it trigger coverage pursuant to sections of the 2010, 2011, and 2012 policies issued by Plaintiff, specifically, coverage for damages caused by "advertising injury."[5] *Id.* Plaintiff disputes that the allegations in the underlying litigation seek damages for "advertising injury" as defined in the policies. *Id.* ¶ 29. Plaintiff further contends that even if Global's claim in the underlying litigation can be construed as claiming damage from "advertising injury," policy exclusions operate to prevent coverage. While disputing coverage, Plaintiff agreed to provide Defendants with defense in the underlying lawsuits under a reservation of rights. Plaintiff filed suit in this Court on January 21, 2014, seeking declaratory relief, more particularly, a "declaration of no coverage" in the instant action. Compl. ¶ 29. Before the Court is Plaintiff's Motion for Summary Judgment.[6]

---

[4] ICC-ES is "a nonprofit, limited liability company that does technical evaluations of building products, components, methods, and materials." ICC Website, "Who We Are," available at http://www.icc-es.org/Help/about.shtml. Retrieved on January 13, 2016.

[5] Defendants seek coverage for "advertising injury." The 2010 policy, Docket No. 32, Ex. 1, provides coverage for "advertising injury," while the 2011 and 2012 policies, Docket No. 32, Exs. 2 and 3, refer to "personal and advertising injury." However, the parties agree that the relevant coverage in the 2011 and 2012 policies is "advertising injury" and, as such, the Court will not further reference the unrelated "personal injury" section of the 2011 and 2012 policies.

[6] Defendants devote a significant portion of their Opposition to Plaintiff's Motion, Docket No. 40, to argument that the Court's resolution of Plaintiff's Motion is premature because of Defendants' pending counterclaim. Defendants also separately filed a Motion to Stay, Docket No. 36, on August 20, 2015. The Motion to Stay repeated Defendants' arguments concerning the premature nature of Plaintiff's Motion for Summary Judgment. On September 28, 2015, the Court denied Defendants' Motion to Stay, finding that consideration of Plaintiff's Motion was not premature. Order, Docket No. 48. On October 15, 2015, the Court denied Defendants' Motion for Reconsideration on the same issue. Order, Docket No. 60. Because the Court has already ruled that consideration of Plaintiff's Motion for Summary Judgment prior to resolution of Defendants' counterclaim is not premature, the Court does address Defendants' arguments on this point.

### III.   STANDARD OF REVIEW

"Interpretation of insurance policies is a question of law, in which the policy is construed as a whole and each clause is given force and effect." *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 325 (Wash. 2002). "In Washington, insurance policies are construed as contracts.  An insurance policy is construed as a whole, with the policy being given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance . . . [a]ny ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured.  A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 15 P.3d 115, 122 (Wash. 2000) (internal quotations omitted).  If the language of the policy is clear and unambiguous, the court must enforce the policy as it is written and may not modify the policy or create ambiguity where none exists. *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1025 (Wash. 1994) (en banc).

In determining whether the insurer has a duty to defend, courts "'look at the 'eight corners' of the insurance contract and the underlying complaint.'" *Nat. Union Fire Ins. Co. of Pittsburg v. Coinstar, Inc.*, 39 F. Supp. 3d 1149, 1156 (W.D. Wash. 2014) (citing *Expedia, Inc., v. Steadfast Ins. Co.*, 329 P.3d 59, 64 (Wash. 2014) (en banc)).  Because duty to defend cases turn on the purely legal questions of interpretation of insurance policies and complaints, they are routinely resolved at the summary judgment stage. *See, e.g., Nat. Union Fire Ins. Co.*, 39 F. Supp. 3d at 1156; Fed. R. Civ. P. 56(a) (summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

An insurer has a duty to defend "when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's

coverage." *Unigard Ins. Co. v. Leven*, 983 P.2d 1155, 1160 (Wash. Ct. App. 1999). "[A]lleged claims that are clearly not covered by the policy relieve the insurer" of the duty to defend. *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d 1124, 1126 (Wash. 1998). If a claim could impose liability on the insured in a manner that is within the policy's coverage, the court must examine the policy to determine if any policy exclusion "clearly and unambiguously applies to bar coverage." *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167, 1172 (Wash. 2000) (citing *Diamaco, Inc. v. Aetna Cas. & Sur. Co.*, 983 P.2d 707, 709-12 (Wash. Ct. App. 1999)). If so, there is no duty to defend. "Exclusionary clauses contained in insurance policies are strictly construed against the insurer." *Stouffer & Knight v. Cont'l Cas. Co.*, 982 P.2d 105, 109 (Wash. Ct. App. 1999).

## IV.    UNDERLYING LITIGATION

Because the Court must determine if there is coverage based on the facts as alleged in the complaint in the underlying litigation, the Court looks to the most recent amended complaint, filed on December 1, 2015, which the Court shall reference as the "Underlying Complaint." Decl. of David R. Greenberg, Docket No. 71, Ex. A. The plaintiffs in the underlying litigation are Global Building Products, Ltd., and its affiliates (collectively, "Global"). Underlying Compl. ¶¶ 1-4. The defendants in the underlying litigation are numerous (see footnote 3) and are alleged to be collectively controlled by Defendant Scott Clarke. *Id.* ¶¶ 5-13.

The underlying litigation concerns Chemco, Inc. ("Chemco"), a Washington corporation that manufactures fire-retardant chemicals used to treat wood products. *Id.* ¶ 14. Chemco has sold its chemicals under various names, including CHEMCO 1000, THERMEX, THERMEX-FR, CPX, and FTX. *Id.* All these products use the same chemical formulation and method of manufacture, referred to in the underlying litigation as "Chemco Chemical." *Id.*

In December, 2007, Global acquired Chemco's wood-roofing treatment business, including rights to "the Chemco Chemical formulation and method of manufacture for use in treatment of wood roofing material and . . . technology, information and approvals for use of the Chemco Chemical in the treatment of western red cedar roofing shakes and shingles . . . ." *Id.* ¶ 24. More specifically, the acquired assets included:

> "[a]ll the proprietary fire retardant chemical formulations . . . manufactured or used, by Chemco . . . [t]he proprietary methods of manufacture of the Chemco Chemical . . . [t]he proprietary processes and manufacturing and quality control criteria, manuals, and information (including specifications concerning chemical uptake quantities, kiln temperatures and times, and pressure levels and times) . . . [t]he California State Fire Marshal ("CSFM") product listing, the ICC Evaluation Service ("ICC-ES") report, and any similar governmental or independent evaluation agency listings, approvals or reports . . . (collectively, the "Chemco Approvals"); . . . and . . . [t]he tests, evaluations and reports . . . concerning the use of the Chemco Chemical to treat wood roofing material, including all such information used to secure the Chemco Approvals."

*Id.* ¶ 25.

At the time of Global's 2007 acquisition of Chemco's business, Chemco had an existing agreement to treat Underlying Defendants' wood roofing products that was not set to expire until January 1, 2012. *Id.* ¶ 26. This agreement also contained a clause to the effect that, should the agreement be terminated prior to its expiration in 2012, Underlying Defendants could still use the Chemco Chemical to treat their wood roofing material for the remaining term of the agreement.[7] *Id.* Global alleges that it knew only that Chemco provided services to Underlying Defendants, and that Chemco's owners "affirmatively misrepresented and concealed material facts concerning the nature of Chemco's business relationship" with the Underlying Defendants. *Id.* ¶¶ 27-28.

After Global acquired Chemco's treatment business, Chemco informed Underlying Defendants that it was terminating their agreement. *Id.* ¶ 30. In response, Underlying Defendants

---

[7] Underlying Defendants were to make "specified payments" to Chemco for this privilege. Underlying Compl. ¶ 26.

1
2
3
4
5
6
7
8
9
10

sought a license from Chemco to use the Chemco Chemical which, as a consequence of Global's acquisition, was no longer owned by Chemco. *Id.* ¶¶ 31-32. Chemco then attempted to withdraw its termination of the agreement, and sought Global's approval to use the Chemco Chemical to treat Underlying Defendants' wood roofing products for four year (the remaining term of the original agreement). *Id.* ¶ 33. Global agreed that Chemco could do so as long as the arrangement was "economically neutral" to Global, *i.e.*, that Global would receive the profit it would have made had it treated Underlying Defendants' product rather than Chemco. *Id.* Accordingly, Chemco continued to treat Underlying Defendants' product until 2009,[8] when Global began treating Underlying Defendants' product (using Chemco Chemical) until mid-2010. *Id.* ¶ 34.

11
12
13
14
15
16
17
18
19
20
21
22
23

In 2010, "[Chemco Officer] Amundson and Scott Clarke . . . began to execute a scheme" whereby Underlying Defendants would lease Chemco's treatment facilities and equipment for use in treating their wood products and Chemco would provide the Chemco Chemical without authorization by Global. *Id.* ¶ 40. Chemco also agreed to provide help "in securing product and manufacturing inspections, listings, approvals and reports for wood roofing products" for the wood roofing products treated by Underlying Defendants that would be identical to the "Chemco Approvals" that had been sold to Global. *Id.* "Acquiring such identical approvals . . . was essential so that [Underlying Defendants'] . . . wood roofing products could be sold and marketed effectively in competition with [Global's] roofing products." *Id.* Global alleges that "Scott Clarke understood, or in the exercise of reasonable care should have understood, that Chemco . . . [was]

24
25

---

[8] At this time Chemco "suspended its wood treatment operations," because Chemco and Global had agreed that fire retardant treatment services would take place at Global's facility. Underlying Compl. ¶¶ 34-36. Chemco obtained Defendant Scott Clarke's signature on a "Termination Agreement" that acknowledged that Underlying Defendants had no continuing rights under the earlier agreement with Chemco and would have to deal with Global going forward. *Id.* ¶ 38. Chemco provided Global a copy of the Termination Agreement, and Global concluded that the dispute between Chemco and Underlying Defendants had been resolved. *Id.* ¶ 39.

1    prohibited . . . from supplying the Chemco Chemical . . . ." *Id.* ¶ 41. Global alleges that "[k]nowing

2    that Global would not consent to Chemco supplying the Chemco Chemical . . . [Chemco Officer]

3    Amundson and Scott Clarke concocted a scheme to avoid detection." *Id.* ¶ 42. Clarke and

4    Amundson agreed that the Chemco Chemical being provided to Underlying Defendants would be

5    called "CPX" rather than "THERMEX" (then the primary name being used by Chemco for the

6    Chemco Chemical). *Id.* Global alleges that the purpose of this name switch "was to permit

7    Chemco and [Underlying Defendants] . . . to assert that Chemco was manufacturing a different

8    fire retardant . . . Scott Clarke . . . advised Global . . . that Chemco was manufacturing a fire

9    retardant . . . based on a different formulation owned by [Underlying Defendants] and denied that

10   the chemical being supplied [to Clarke] . . . by Chemco was the Chemco Chemical." *Id.* However,

11   Underlying Defendants represented to CSFM, ICC-ES, and purchasers of treated wood products

12   that the chemical was "identical" to Global's Chemco Chemical. *Id.* ¶ 43. Global alleges that

13   Chemco and Scott Clarke worked together to create and assert "frivolous legal and factual

14   arguments" to counter Global's rights, and also made other "knowingly false arguments . . . ." *Id.*

15   ¶ 44. Global also alleges that Defendant Clarke "misrepresented and concealed the true facts." *Id.*

16   ¶ 45.

17       Following these events, Global initiated an international arbitration proceeding against

18   Chemco. *Id.* ¶ 46. Global prevailed in arbitration and was awarded $2.1 million in damages and

19   costs against Chemco. *Id.* ¶ 47. This arbitration award was confirmed in the United States District

20   Court for the Western District of Washington. *Id.* ¶ 48; *Global Bldg. Prods. Ltd. v. Chemco, Inc.*,

21   No. 12-1017, Docket No. 32 (W.D. Wash. Oct. 18, 2012).

22       Global further alleges that from May 2010, when Underlying Defendants began using Chemco

23   Chemical and Chemco facilities to treat their wood products, through September, 2010, the

8

chemical supplied to Underlying Defendants was identified as THERMEX, the same trade name of the Chemco Chemical bought by Global.  *Id.* ¶ 49.  In September 2010, after Global had discovered that Underlying Defendants were "distributing Clarke Group branded cedar wood roofing materials that had been fire retardant treated" by Underlying Defendant at Chemco's facility, Underlying Defendants and Chemco began referring to the chemical as CPX, although the chemical was identical to THERMEX.  *Id.*  Global alleges this was part of Chemco and Defendant Clarke's "scheme to conceal their improper activity from Global."  *Id.*  Global alleges that Chemco disclosed the formulation and method of manufacture of Chemco Chemical to Defendant Clarke at his request.  *Id.* ¶ 50.  Global alleges that Defendant Clarke had "knowledge and active participation in the scheme to misappropriate Global's trade secrets."  *Id.* ¶ 51.  Global further alleges that "Scott Clarke . . . understood that this CPX chemical ruse was being undertaken in an effort to conceal the fact that Chemco was supplying the Chemco Chemical to [Underlying Defendants] to treat wood roofing material."  *Id.*

Global alleges that Underlying Defendants "made false, misleading or deceptive representations to government agencies, the ICC-ES, resellers, roof installers and the public concerning the characteristics, qualities, endorsements and approvals" of their treated wood roofing products.  *Id.* ¶ 59.  Among these false statements were assertions that Underlying Defendants owned the rights to the fire retardant chemicals being used to treat the wood, that Underlying Defendants had approvals from CFMS and ICC-ES, and that the products were legal for sale in California.  *Id.*  Global also alleges that Underlying Defendant used test results and data used by Chemco to secure the Chemco approvals, and that this data was owned by Global.  *Id.* ¶ 60.  Global alleges that without this data Underlying Defendants "would not have obtained ICC-ES and CSFM approvals without conducting time-consuming and costly required qualifying tests

. . . ." *Id.*  Global alleges that Underlying Defendants "were well aware of Global's rights" and knew "that Chemco was not entitled to supply Chemco Chemical to anyone other than Global . . . ." *Id.* ¶ 61.  Global alleges that, while aware of Global's rights, Underlying Defendants "nevertheless proceeded to intentionally, willfully and wrongfully interfere with" Global's business opportunities and commercial interests and engage in unfair competition. *Id.* ¶ 63.  Global alleges that in April, 2012, Underlying Defendants had been notified by the arbitrator that they were not permitted to use either Chemco Chemical or CPX version of the chemical, but continued to do so and to "market, advertise and sell such products." *Id.* ¶ 64.  Global also alleges that after ICC-ES and CSFM had revoked and refused to renew their approvals for Underlying Defendants' products, Defendants continued to label and distribute bundles of treated roofing materials indicating that the products had such approvals. *Id.* ¶ 65.

Following discovery by Global of Underlying Defendants' actions and a court order restraining ATC (one of the Underlying Defendants) from selling wood roofing products (as well as recalling ATC's extant wood roofing products), ATC filed for bankruptcy. *Id.* ¶ 68.  Global further alleges that Underlying Defendants commingled wood roofing products they had treated with roofing products treated by Global "in order to give the false and misleading impression to resellers and consumers" that Underlying Defendants' product "was actually [Global's] product." *Id.* ¶ 74.

Global asserts a total of ten causes of action against Underlying Defendants:

1. Misappropriation of Trade Secrets and Confidential Information.  *Id.* ¶¶ 75-86.
2. Violation of the Lanham Act, 15 U.S.C. § 1125(a).  *Id.* ¶¶ 87-105.
3. Violation of the Washington Unfair Business Practices and Consumer Protection Act.  *Id.* ¶¶ 106-115.
4. Intentional Interference with Contract and Prospective Business Advantage (Washington).  *Id.* ¶¶ 116-121.
5. Intentional Interference with Contract and Prospective Business Advantage (California).  *Id.* ¶¶ 122-127.
6. Common Law Unfair Competition (California).  *Id.* ¶¶ 128-131.
7. Common Law Unfair Competition (Washington).  *Id.* ¶¶ 132-135.

8.  Declaratory Relief (that Underlying Defendants have no current right under their agreement with Chemco to use Chemco Chemical). *Id.* ¶¶ 136-145.

9.  Declaratory Relief (that Underlying Defendants' claimed right to a license to use Chemco Chemical is barred by laches or a statute of limitations). *Id.* ¶¶ 146-150.

10. Declaratory Relief (that the termination agreement between Underlying Defendants and Chemco waived Underlying Defendants' claim that they may obtain a license to use Chemco Chemical). *Id.* ¶¶ 151-154.

## V.     ANALYSIS

The Court now looks to the insurance policies at issue to determine if the facts alleged in the Underlying Complaint could potentially lead to liability on the part of Defendants and, if so, whether that liability is covered by the policies.  Plaintiff insured Defendants pursuant to three policies issued from 2010 to 2012.  The 2011 and 2012 policies are identical.  *See* Docket No. 32, Exs. 2 and 3.  The 2010 policy contains slightly different provisions from the 2011 and 2012 policies.  *Id.*

### A.  Extent of Coverage

The 2010 Policy provides coverage for "'advertising injury' caused by an offense committed in the course of 'advertising' your goods, products or services."  Docket No. 32, Ex. 1 at 10 of 47.  "Advertising injury" is defined by the policy as injury "arising out of one or more of the following offenses . . . [m]isappropriation of advertising ideas or style of doing business except as related to or arising out of infringement of patent, copyright, trademark, title, slogan or service mark."[9]  *Id.*  The 2011 and 2012 policies define "advertising injury" slightly differently as "injury . . . arising out of one or more of the following offenses": "[t]he use of another's advertising idea in your 'advertisement,'" or "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'"  Docket No. 32, Ex. 2 at 39 of 52.

---

[9] The Court has omitted all offenses not relevant to this case.

1    "Advertising" is defined by the 2010 policy as "the action of calling something to the

2    attention of the public by means of printed or broadcast paid announcements for the sale of goods,

3    products or services."   Docket No. 32, Ex. 1 at 15 of 47.   In the 2011 and 2012 policies,

4    "advertisement" is defined as "a notice that is broadcast or published to the general public or

5    specific market segments about your goods, products or services for the purpose of attracting

6    customers or supports."   Docket No. 32, Ex. 2 at 37 of 52.

7       **A.  Whether the Allegations in the Underlying Complaint Trigger Coverage**

8        The 2010 and 2011/12 versions of the policies cover "advertising injury" "in the course of

9    'advertising'" or "in your advertisement."   Thus, for coverage to exist, not only must the

10   allegations in the Underlying Complaint potentially create liability for "advertising injury" caused

11   by Defendants, but said injury must have occurred through Defendants' advertisements, *i.e.*,

12   through "printed or broadcast paid announcements for the sale of goods, products or services" or

13   through "a notice that is broadcast or published to the general public or specific market segments

14   about your goods, products or services . . . ."

15       Defendants contend that Plaintiff's duty to defend under the 2010 and 2011/12 policies is

16   triggered by the facts alleged in the Underlying Complaint.   However, as is clear from the Court's

17   discussion of the Underlying Complaint, *supra* pp. 5-10, the Underlying Complaint does not allege

18   "[m]isappropriation of advertising ideas or style of doing business," or "infringing upon another's

19   copyright, trade dress, or slogan . . . ."   Indeed, the word "advertise" is only mentioned in passing

20   in a single paragraph of the 154-pargraph Underlying Complaint.   This allegation states that

21   Defendants ignored a valid arbitration determination that they refrain from further use of the

22   Chemco Chemical and of Global's trade secrets and approvals.   Instead, Global alleges,

23   Defendants continued to "market, advertise and sell [their] products."   Underlying Complaint ¶

24

25

12

64.  The Underlying Complaint's language quite clearly alleges, *inter alia*, misappropriation of trade secrets, confidential information, third-party approvals, and unfair competition.  The Underlying Complaint goes on to set forth detailed allegations concerning Defendants alleged skullduggery and misappropriation of trade secrets (namely, the Chemco Chemical formula and method of manufacture); none of these allegations involve use of Global's advertising ideas, style of doing business, or trade dress.

Defendants nevertheless argue that allegations in the Underlying Complaint, construed liberally, demonstrate that they may be potentially liable for "advertising injury" that is "call[ed] to the attention of the public by means of printed or broadcast paid announcements for the sale of goods, products or services":

1.  Misappropriation of "Advertising Idea"

Defendants point to Global's allegation that they "made false, misleading or deceptive representations to government agencies, the ICC-ES, resellers, roof installers and the public concerning the characteristics, qualities, endorsements and approvals" of their treated wood roofing products. *Id.* ¶ 59.  Among these alleged false statements were that Underlying Defendants owned the rights to the fire retardant chemicals being used to treat the wood, that Underlying Defendants had approvals from CFMS and ICC-ES, and that the products were legal for sale in California. *Id.*  Defendants contend that this constitutes "misappropriation of an advertising idea" as defined by the policies.

The Court first notes that lacking from these allegations is any reference to "printed or broadcast paid announcements" directed to the public.   As such, these allegations simply do not constitute "advertising" as defined by the policy.

13

Even assuming that these allegations could be considered related to Defendants' "advertising," it does not support a finding of liability based upon misappropriation of an "advertising idea." The term "misappropriation of an advertising idea" has been defined by the Washington courts[10] as the "wrongful taking of another's manner of advertising," "the wrongful taking of an idea concerning the solicitation of business and customers," or the "the wrongful taking of the manner by which another advertises its goods or services." *Amazon.com Int'l, Inc. v. Am. Dynasty Surplus Lines Ins. Co.*, 85 P.3d 974, 976 (Wash. Ct. App. 2004). "The misappropriation must occur 'in the elements of the advertisement itself—in its text, form, logo, or pictures—rather than in the product being advertised.'" *Id.* at 977 (quoting *Iolah Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1506 (9th Cir. 1994)). Taking another entity's *product* and trying to sell that product is not advertising injury:

> [i]f the insured took an idea for soliciting business or an idea about advertising, then the claim is covered . . . [b]ut if the allegation is that the insured wrongfully took a patented product and tried to sell that product, then coverage is not triggered."

*Auto Sox USA Inc. v. Zurich N. Am.*, 88 P.3d 1008, 1010-11 (Wash. Ct. App. 2004). In other words, misappropriation of an advertising idea involves stealing the manner in which another entity advertises goods, emulating their form, logo, or trade dress, and does not extend to appropriating another entity's goods and passing them off as your own.

Similarly, Defendants alleged misappropriation of Global's CSFM and ICC-ES approvals, as well as Defendants allegedly false representation that they possessed said approvals, is not "misappropriation of an advertising idea." These approvals are issued to signify that a producer's products comply with certain industry standard; they are not "advertising ideas." *Applied Bolting*

---

[10] Defendants also attempt to argue that the term "misappropriation of an advertising idea" is ambiguous, citing out-of-state cases. *See* Defs.' Opp'n, Docket No. 40, at 15-16. The Court finds that the term is clearly defined by Washington law and is not ambiguous.

14

*Tech. Prods., Inc. v. United States*, 942 F. Supp. 1029 (E.D. Pa. 1996) (holding that industry

standards are not "advertising ideas").

2.   Misappropriation of "Trade Dress"

The 2011 and 2012 policies provide coverage for infringement on "trade dress . . . in your

'advertisement.'"  "Trade dress" is not defined in the policy but has been interpreted by the courts

to mean "the total image of a product and 'may include features such as size, shape, color, color

combinations, texture or graphics.'"  *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th

Cir. 1989) (quoting *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987)).  Trade

dress is "essentially [a product's] total image and overall appearance."  *Taco Cabana Intn'l, Inc.

v. Two Pesos, Inc.*, 932 F.2d 1113, 1118 (5th Cir. 1991).  Thus trade dress "protects aspects of

packaging and product design that cannot be registered for trademark protection . . . [and] requires

the court to focus on the plaintiff's entire selling image . . . ."  *Vision Sports, Inc.*, 888 F.2d at 613.

In *Visions Sports* the court found that the plaintiff had asserted a trade dress claim where the

plaintiff's cause of action "focuses upon the look and styling" of the product "along with the color

scheme and graphic display embodied in the [plaintiff's] logo."  *Id.*

There are no allegations in the Underlying Complaint that Defendants attempted to emulate

the "look and styling" of Global's product, or infringed on the "color scheme and graphics" of

Global's logo.  Nor is there any allegation that Defendants infringed on the "overall appearance"

of Global's product.  There are certainly no allegations that Defendants infringed on trade dress in

any advertisement, *i.e.*, any "notice that is broadcast or published to the general public or specific

market segments about your goods, products or services for the purpose of attracting customers or

supports."  2011 Policy, Docket No. 32, Ex. 2 at 37 of 52.  Instead, Defendants point to a single

allegation in the Underlying Complaint that states that Defendants "sought to intermingle or blend

15

. . . [their] inventory of [wood treat by Underlying Defendants] with wood roofing product treated by [Global], so that the purchaser, installer or ultimate consumer will mistakenly believe they are purchasing product that was treated by [Global] that is covered by [Global's ICC-ES and CSFM approvals, and is subject to [Global's] warranty." Underlying Compl. § 99.  This allegation, even construed liberally, does not allege trade dress infringement in an advertisement.  Defendants again attempt to blur the distinction between appropriation of a product's *image* (trade dress) for use in an advertisement, and appropriation of the *product itself*.  Based on the allegation above, Defendants took some of Global's wood products and intermingled those products with their own wood products that had been treated with Global's Chemco Chemical.  As the court held in *Auto Sox USA*, if an insured "wrongfully took a patented product and tried to sell that product," there is no "advertising injury" and "coverage is not triggered." 88 P.3d at 1010-11.

3.  Misappropriation of "Style of Doing Business"

Defendants also briefly argue that their alleged misuse of data and reports that Global had purchased from Chemco constitutes "misappropriation of style of doing business."  As discussed above, Global alleges that Defendants were given the test results and data used by Chemco to secure the Chemco Approvals, despite being aware that this data was owned by Global. Underlying Compl. ¶¶ 60-61.  Global alleges that without this data Defendants "would not have obtained ICC-ES and CSFM approvals without conducting time-consuming and costly required qualifying tests . . . ." *Id.*  Defendants contend that, if true, their theft and misuse of this data could be considered misappropriation of Global's "style of doing business."

This argument is meritless.  Style of doing business is widely understood to "refer[] to a company's 'comprehensive manner of operating its business.'" *Applied Bolting*, 942 F. Supp. 1029 at 1034 (quoting *Poof Toy Prods., Inc. v. United States Fidelity and Guar. Co.*, 891 F. Supp.

1228, 1232 (E.D. Mich. 1995)); *see also St. Paul Fire & Marine Ins. Co. v. Advanced Int'l Sys., Inc.*, 824 F. Supp. 583, 585 (E.D. Va. 1993) (same).  It has also been understood by the courts as "expressing essentially the same concept as the more widely used term: 'trade dress.'" *St. Paul Fire & Marine Ins. Co.*, 824 F. Supp. at 585.  Chemco's data and test results used to obtain CSFM and ICC-ES approvals are unrelated to Global's "style of doing business" as they do not concern Global's "comprehensive manner of operating its business."  Further, for the reasons given *supra* pp. 16-17 in the Court's discussion of trade dress, the allegations in the Underlying Complaint simply do not set forth claims for misappropriation of style of doing business/trade dress.

**B.  Whether Exclusions Apply to Bar Coverage**

The Court has already found that the allegations in the Underlying Complaint clearly fall outside of the coverage of Plaintiff's policies.  However, even if the allegations in the Underlying Complaint theoretically did allege "advertising injury" occurring in the course of Defendants' "advertisements," a number of exclusions apply that would bar coverage.

1.  Exclusions for Infringement, Violations of Rights of Another

a.  2010 Policy

The 2010 policy excludes "alleged or actual infringement of any patent, copyright, trademark, title, slogan, service mark or statutory unfair competition, common law competition, violation of the Lanham Act, anti-trust violations or misappropriation of trade secrets."  Docket No. 32, Ex. 1 at 10-11 of 47.  Count One of the Underlying Complaint is for "Misappropriation of Trade Secrets."  Count Two of the Underlying Complaint is for "Lanham Act Violation." Counts Six and Seven of the Underlying Complaint allege "Unfair Competition."  Each of these counts is explicitly excluded.

17

b.  2011/12 Policy

The 2011/12 policies exclude "the infringement of copyright, patent, trademark, trade secret or other intellectual property rights."  Docket No. 32, Exs. 2 and 3 at 31 of 52.  Count One, Misappropriation of Trade Secrets, is thus explicitly excluded by this exclusion.  The 2011 and 2012 policies also exclude injury stemming from the "[k]nowing violation of rights of another," which is described as "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict . . . 'advertising injury.'"  *Id.* at 31 of 52. Defendants are alleged to have "execute[d]" and concocted a scheme" to secretly misappropriate the formula and method of manufacture of Chemco Chemical because of Defendants' knowledge that Global would not agree to provide the Chemco Chemical.  Underlying Compl. ¶¶ 40-42. Further, Defendants are alleged to have changed the name of Chemco Chemical to CPX as part of a "scheme to conceal their improper activity," in which Defendants "understood that this CPX chemical ruse was being undertaken in an effort to conceal" misappropriation of trade secrets.  *Id.* ¶¶ 49-51.  Defendants are alleged to have had "knowledge and active participation in the scheme to misappropriate Global's trade secrets."  *Id.*  These allegations make it clear that Defendants' actions in relation to Count One of the Underlying Complaint, for "Misappropriation of Trade Secrets," Count Two of the Underlying Complaint, for "Lanham Act Violation," and Counts Six and Seven of the Underlying Complaint, for "Unfair Competition," were, according to the Underlying Complaint, done with "knowledge that the act would violate the rights of another . . . ."  As such, they are unambiguously excluded by the 2011/12 policies.

2.  Exclusions for Advertising Injury Caused by Knowingly False Publication

The 2010 and 2011/12 policies exclude "advertising injury" that "aris[es] out of oral or written publication, if done by or at the direction of the Insured with knowledge of its falsity."

18

2010 Policy, Docket No. 32, Ex. 1 at 15; 2011/12 Policies, Docket No. 32, Exs. 2 and 3 at 31 of 52.

As noted above, the Underlying Complaint contains numerous allegations that Defendants acted with knowledge of the falsity of their claims and actions. Counts Four and Five of the Underlying Complaint are for "Intentional Interference with Contract and Prospective Business Advantage." Defendants are alleged to have been "well aware of Global's rights," when they "intentionally, willfully, and wrongfully interfere[d] with" Global's business." Underlying Compl. ¶¶ 61-63. These claims are unambiguously excluded by the 2010 and 2011/12 Policies' exclusion of advertising injury done with knowledge of falsity. In addition, the Court finds that this exclusion would also unambiguously apply to bar coverage for Count One, Misappropriation of Trade Secrets, as Plaintiff alleges that Defendants "understood that this CPX chemical ruse was being undertaken in an effort to conceal" said misappropriation. Underlying Compl. ¶ 51. Similarly, Count Three, for violation of the Washington Unfair Business Practices and Consumer Protection Act, is based upon the allegations, discussed above, that Defendants misappropriated Global's Chemco Approvals and made affirmative misrepresentations to CSFM and ICC-ES to obtain approvals. *Id.* ¶¶ 106-115. Even if these allegations constitute "advertising injury," they fall within the exclusion for knowingly false advertising injury.[11]

## VI.    CONCLUSION

For the reasons stated above, misappropriation of a product and its qualities is not the same as misappropriation of an advertising idea, style of business, or trade dress. Global does not allege damage due to Defendants' imitation or use of Global's advertisements or logos. It is clear that

---

[11] The Court finds that Counts One through Seven are unambiguously excluded by the 2010 policy. The remaining Counts, Eight through Ten, are for declaratory relief and are concerned with Defendants' contractual rights and/or obligations. These Counts are clearly not seeking damages for "advertising injury" and are not covered by the policy.

1     the alleged misappropriation for which Global seeks damage is for the theft of the formula and

2     method of manufacture for the production of Chemco Chemical and resulting unfair competition.

3           Accordingly, the allegations and claims in the Underlying Complaint do not expose

4     Defendants to liability for "advertising injury" occurring in the course of "advertisements" and, as

5     such, are clearly not covered by the policies issued by Plaintiff.  The Court further finds that even

6     if Global's claims in the underlying litigation could be construed as claiming damage for

7     "advertising injury," policy exclusions would operate to prevent coverage.

8           **NOW THEREFORE: IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary

9     Judgment, Docket No. 30, is **GRANTED**.  **IT IS FURTHERED ORDERED** that Plaintiff has

10    no duty to defend Defendants in the Underlying Litigation.

11

12

13    DATED this 21st day of January, 2016.

14

15

16

17

18                     _____

                       BARBARA J. ROTHSTEIN

19                        UNITED STATES DISTRICT JUDGE

20

21

22

23

24

25